## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| MICHAEL DARNELL SMITH, | * | |
| Plaintiff | * | |
| v | * | Civil Action No. CCB-17-3232 |
| RICHARD D. DOVEY, | * | |
| JAMES R. YOUNKER, | | |
| BERNARD B. POWELL, | * | |
| ANNA HARTLE, | | |
| JOHN W. COLLIFLOWER, | * | |
| COLE D. YOUNG, and | | |
| MICHAEL HIXON | * | |
| Defendants | * | |

*** 

### MEMORANDUM OPINION

In response to the above-titled amended civil rights complaint, Defendants Warden Richard D. Dovey, Captain James R. Younker, Lt. Bernard B. Powell, Sgt. Michael Hixon, Correctional Case Management Specialist II Anne Hartle, retired Correctional Sergeant John Colliflower, and Correctional Officer Cole D. Young filed a renewed Motion to Dismiss or, in the Alternative, for Summary Judgment. ECF 97 (renewing ECF 30, 47, 61, and 63). Plaintiff was advised of his opportunity to respond to the motions. ECF 31, 49, 64 and 98. He responded to the initial motions (ECF 39 and 65, 68) and Defendants replied. ECF 48. Plaintiff was granted the opportunity to engage in limited discovery. ECF 69. After defendants renewed their dispositive motions, plaintiff sought and was granted several extensions of time to respond to the renewed dispositive motions (ECF 100, 102, 103, 104 and 105), after which he filed a response (ECF 106). The court finds a hearing in this matter unnecessary. *See* Local Rule 105.6. For the reasons that follow, defendants' motion, construed as a Motion for Summary Judgment, shall be granted in part and denied in part.

# I.     Background

## A.  Varady ARP

In his verified Complaint, as amended, plaintiff Michael Darnell Smith, alleges that on October 23, 2014, while housed at Maryland Correctional Institution-Hagerstown ("MCIH") he reported to an officer that he was hypertensive and experiencing chest tightness and lightheadedness. ECF 82-2, p. 3 (Am. Compl.). The officer issued plaintiff a pass to medical but did not provide a stretcher for plaintiff or ask plaintiff to wait to be transported to the medical unit. *Id*. When plaintiff arrived at medical, Officer Varady and RN Jennifer Hager initially denied plaintiff an evaluation because he did not arrive on a stretcher, refused to provide the nurse's last name, and threatened to put him on lock-up. Ultimately he was evaluated. *Id*., pp. 3-4.

Plaintiff completed an Administrative Remedy Procedure ("ARP") regarding his interaction with Varady (ECF 82-2, p. 4) and attempted to submit it to Sgt. Colliflower on November 3, 2014, but after remarking on its length, Colliflower said he would give plaintiff the signed copy at a later time because he needed to read the ARP in order to determine if it concerned a threat made by staff toward plaintiff, and said, "I may have to lock you up!" *Id*., pp. 4-5. Because plaintiff had experienced problems with Colliflower in the past, he brought with him a copy of Division of Correction Directive ("DCD") 185-002, which provides instructions to staff regarding the process for accepting an ARP, and read it to Colliflower. *Id*. Despite plaintiff's effort, Colliflower did not provide plaintiff a signed copy of his ARP and instead told plaintiff to get away from him. When plaintiff asked if the unit lieutenant was present, Colliflower replied, no and instructed plaintiff not to bring the ARP back or he would go "there", pointing toward MCIH's segregation unit. *Id*. Plaintiff alleges that "Colliflower was angry at [him] for pointing out his failure to follow the established procedure for the acceptance of his complaint…." *Id*., p. 6. For

his part, Colliflower does not recall the November 3, 2014, interaction with plaintiff in the dining hall. ECF 47-2, p. 2, ¶ 4 (Colliflower Decl.).

### B. November 4, 2014, Cell Search

According to Sgt. Colliflower, on November 4, 2014, he received an anonymous tip in the housing unit's mailbox stating that plaintiff had a cell phone in his cell. ECF 47-2, p. 2, ¶ 5. Colliflower ordered Correctional Officers Hixon and Young to assist him in searching the cell plaintiff shared with Brandon Felix. ECF 30-4, p. 2, ¶ 4 (Hixon Decl.); ECF 47-2, p. 2, ¶ 5. Colliflower, Young, and Hixon came to plaintiff's cell with a property cart and directed plaintiff to step out of the cell. ECF 82-2, p. 6. Given his interaction with Colliflower the day before, plaintiff states he was apprehensive about the officers' intent. *Id*. Young patted plaintiff down and plaintiff pointed out which was his bunk and where his property was located. *Id*. Young put plaintiff's linens and bedding in the cart. Hixon removed paperwork which was stored under plaintiff's mattress. *Id*. The ARP concerning Varady that plaintiff attempted to submit the previous day was on the top shelf of his locker and when Young found it, he said, "here it is" and all three officers "began . . . flipping through its pages." *Id*. Young then resumed throwing plaintiff's property into the cart. The officers directed plaintiff back into his cell and plaintiff feared he would be assaulted. *Id*., p. 7. Colliflower shook his finger in plaintiff's face and stated, "Don't you ever fucking disrespect me in the chow hall like that again . . . Don't tell me how to do my job . . . I know my fucking job and I know you know yours!" *Id*. (ellipsis in original). Plaintiff apologized and Young responded that it was plaintiff's lucky day, tore up the ARP, and flushed it down the toilet. Young then exited the cell, colliding with plaintiff as he did so. *Id*. Colliflower and Hixon left the cell and instructed plaintiff to unpack his belongings and then the three officers left. *Id*.

Plaintiff alleges that all three officers were trained in the processing of ARPs and that Colliflower was angry at plaintiff for pointing out his failure to follow the proper procedure regarding the ARP. ECF 82-2, pp. 5, 8. Plaintiff alleges that all three officers "secretly agreed" to search his cell and that Colliflower wanted to destroy the ARP concerning Varady because its later submission would show that he had not accepted it as required under DOC policy. *Id.*, pp 8-10. Additionally, plaintiff alleges that other inmates have complained that Colliflower, Young, and Hixon have retaliated against them for filing complaints. ECF 82-2, p. 28.

Colliflower denies threatening or harassing plaintiff. ECF 47-2, p. 3 ¶ 7. He avers that the search of plaintiff's cell was not in punishment or retaliation for plaintiff's filing ARPs but to look for contraband based on the anonymous tip and the search was conducted in accordance with DOC procedures. *Id.*, p. 2, ¶¶ 5-6. Plaintiff counters that after he submitted an ARP regarding the cell search, "Colliflower fabricated the narrative that he ordered the search of plaintiff's cell as a result of an anonymous tip . . . ." ECF 82-2, p. 8. Plaintiff opines that Hixon and Young agreed to Colliflower's account of the basis for the search to avoid disciplinary proceedings. *Id.*, pp. 9–10.

Colliflower does not recall observing any officer damage or destroy an ARP nor does he recall Young or Hixon threatening plaintiff. ECF 47-2, p. 3, ¶ 7. Hixon also avers that the cell search was conducted in accordance with DOC procedures, and to the best of his recollection, he did not observe any officer damage or destroy an ARP during the search. ECF 30-4, p. 2, ¶ 5.

In further support of his claim that the cell search was retaliatory, plaintiff notes DOC policy requires the presence of both cellmates when a cell is searched, but plaintiff's cellmate was not present. ECF 82-2, p. 9.[1] Instead, on the day of the search, Felix advised plaintiff, that three

---

[1] During Gladhill's investigation of the ARP concerning the cell search, he interviewed Officer Robinson who verified that Colliflower directed her to call Felix back to the cell from his job for the search. ECF 30-3, p. 40. She did not recall anything out of the ordinary taking place during the search. Colliflower stood on the tier with plaintiff and observed the other officers while they searched. Robinson could not recall if Felix was present for the search, but she

officers ordered him into an office and interrogated him and "implied that he should move out of the cell" he shared with plaintiff. ECF 82-2, p. 10. Felix reported that the officers threatened that if plaintiff did something, he, Felix, would get into trouble. *Id*. Plaintiff alleges that Colliflower intended to "scare Felix into moving out of the cell." *Id*.

As a result of the cell search, plaintiff states that he experienced anxiety and panic attacks and began to devise routes through the institution that he thought would decrease his contact with Colliflower, Young, and Hixon. ECF 82-2, p. 11. He also began to be suspicious of other officers. *Id*. He felt powerless and had suicidal thoughts, although he did not report those feelings for fear of being placed on suicide watch. *Id*. On November 25, 2014, plaintiff began therapy with Glenroy Robinson, Ph.D., concerning his panic attacks and anxiety. *Id*.

Additionally, plaintiff wrote to Congressman Elijah Cummings explaining his fear of reprisals and asking for an investigation. ECF 82-2, p. 18. Congressman Cummings wrote to Kevin Leob, Director of Legislative Affairs of DPSCS. *Id*.

### C.  Younker Investigation

The day after the cell search, plaintiff spoke with Warden Dovey about his interactions with Colliflower on November 3 and November 4. ECF 82-2, p. 10; ECF 30-5, p. 2, ¶ 4 (Dovey Decl.). Plaintiff advised Dovey that he was more concerned about the three officers' conduct than the issue regarding Varady. He was told that a captain would talk to him.   ECF 82-2, pp. 10–11.

Dovey directed Younker to interview plaintiff about his concerns and he did so that same day. ECF 30-6, p. 2, ¶ 4 (Younker Decl.); ECF 82-2, p. 11; ECF 30-5, p. 2, ¶ 5. Younker advised plaintiff that Dovey assigned him to investigate the incident and he gave plaintiff forms to

---

knew he was called to return for the search. Hixon and Young stated that Felix did not return to the tier until the search was completed. The search was brief because they had specific intelligence regarding the location of contraband and ended the search after searching that area. *Id*., p. 40.

document the incident, which Younker collected from plaintiff on November 6, 2014. ECF 82-2, p. 11. Plaintiff explained to Younker that he attempted to give Colliflower an ARP but Colliflower refused to accept it. He also alleged that Colliflower continued to mistreat him and did not act professionally. ECF 30-6, p. 2, ¶ 4. He claimed that during the November 4 cell search, Young seized and destroyed the ARP. *Id*., p. 3, ¶ 5. Younker directed plaintiff to rewrite the ARP that he claimed was destroyed and give it to him to handle. *Id*., ¶ 6. Instead of rewriting the original ARP as directed, plaintiff advised Younker that he would write a new ARP about the actions of Colliflower, Young, and Hixon during the cell search. *Id*.

Younker interviewed plaintiff's cellmate, Felix, on November 6, 2014, regarding his interactions with Colliflower, Hixon, and Young and he advised that the officers had threatened him with lock-up. ECF 30-6, p. 3, ¶ 7.

On November 6, 2014, Younker submitted a memorandum to Dovey regarding plaintiff's allegations and recommended, given the subject matter of plaintiff's allegations, that the matter be handled by MCIH's internal investigation unit. ECF 30-5, p. 2, ¶ 5; *id.*, p. 3, ¶ 8. The next day, Dovey ordered an investigation of plaintiff's complaint (*id.*, p. 3, ¶ 6) and Lt. Gladhill was assigned as the investigator. *Id*., ¶ 7; ECF 30-3, p. 39.

On November 10, 2014, plaintiff's ARP concerning the search of his cell was received and assigned Case No. MCIH-0826-14. ECF 30-3, p. 25. On December 15, 2014, after an investigation, the ARP was dismissed with a finding that the reports and statements from the officers involved contradicted plaintiff's allegations and that during the cell search "a large amount of paperwork was found. No one recalls seeing the ARP you mentioned." *Id*., p. 25. Moreover, the officers reported acting within the scope of their duties and the ARP coordinator found the allegations unfounded, noting "there is no way to prove either parties' statement." *Id*. Plaintiff's appeal to

headquarters was denied after investigation. *Id.*, pp. 46-71. The headquarters response found, after reviewing reports form staff, that plaintiff had failed to substantiate his claim that he was assaulted or that staff acted unprofessionally. Plaintiff was advised that Intelligence and Investigative Divisions [IID] was notified but did not assign a case number. *Id.*, p. 69.

After plaintiff submitted MCIH-0826-14 but before he submitted a subsequent ARP detailing additional claims of retaliation (MCIH-0897-14), Younker told him that the result of his investigation was on "the boss's desk" and that the investigation was going in plaintiff's favor. ECF 82-2, p. 17. Plaintiff alleges that when he submitted the second ARP (MCIH 0897-14), Younker advised plaintiff that because plaintiff had contacted a congressman the investigation of the previous request was taken out of his hands and expressed disappointment that plaintiff had written the Congressman, stating he thought they "had an agreement to keep it within the institution." [2] *Id.* Plaintiff advised Younker that he was unsure what the officers were capable of and he needed to protect himself by alerting someone outside the institution about what had happened. *Id.*

Plaintiff alleges that Younker "did not like the possibility of external scrutiny on MCIH" and his statements to plaintiff were meant to end plaintiff's correspondence with political officials. *Id.*, p. 18. Plaintiff further opines that Younker "did not want to be viewed as an informant by his fellow officers . . . ." *Id.* As a result of Younker's statements plaintiff feared Colliflower, Hixon and Young would not be held accountable and would be emboldened to take further actions against him and that there was no one in authority to whom plaintiff could turn; he also felt isolated and worried that false charges would be filed against him. *Id.*, pp. 18-19.

---

[2] Younker avers that he did have a conversation with plaintiff about his correspondence to the Congressman, but he advised plaintiff he was no longer involved in the investigation of his complaints. ECF 48-2, p. 3, ¶ 7 (Younker Supp. Decl.). Inquiries and correspondence from political officials do not stop institutional investigations (*id.*) and in fact on December 8, 2014, Gladhill was assigned to investigate plaintiff's complaint. *Id.*; ECF 30-3, p. 36.

Additionally, plaintiff claims that the two ARPs he filed concerning alleged retaliatory conduct undertaken by Colliflower, Hixon, and Young were submitted to Younker and on each occasion, plaintiff conveyed to Younker the substance of the ARPs. ECF 82-2, p. 19. Plaintiff claims Younker had supervisory authority over Colliflower, Hixon, and Young and despite Younkers' knowledge of the substance of the allegations, Younker did not convey the allegations to Colliflower, Hixon, or Young's direct supervisor. *Id.*, p. 19. Plaintiff alleges that Younker's failure to take any action showed deliberate indifference or tacit authorization and exacerbated plaintiff's panic attacks and anxiety. *Id.*, pp. 19-20. After submitting the memo to Dovey, recommending plaintiff's allegations be turned over to the internal investigation team, Younker had no further involvement in the investigation of plaintiff's complaints regarding the November 4 and 5, 2014, interactions or the processing of his ARPs. ECF 48-2, p. 3, ¶ 6.

### D.   ARP MCIH-0826-14 and Gladhill's investigation

Although not named as a defendant in his amended complaint, plaintiff claims that Gladhill's investigation of the cell search was improper as he: never interviewed Varady regarding the October 23, 2014 interaction; failed to establish plaintiff interacted with Colliflower the day before the cell search; and failed to recover the Unit 5 mail. ECF 82-2, pp. 8-9.

After investigating plaintiff's claim regarding the cell search, Gladhill wrote a memorandum to Dovey which reported that Hixon and Young recalled being requested by Colliflower to perform a search of the cell after receiving an anonymous letter in the unit mailbox suggesting that he act quickly because plaintiff had contraband in a specific location in his cell. ECF 30-3, p. 39. Gladhill also interviewed plaintiff's cellmate regarding his interaction with the officers that day. *Id*. Felix reported being briefly interviewed by Colliflower regarding contraband in the cell before he returned to his food service detail. *Id.*, p. 40. Felix stated that "He was never

8

threatened but was made aware of the implications of having contraband in the cell." *Id*. When interviewed by Gladhill the officers denied assaulting or being disrespectful toward plaintiff. *Id*., p. 40.

As part of his investigation Gladhill interviewed plaintiff on December 9, 2014, and concluded that plaintiff had no proof of his claim other than his statement. ECF 30-3, p. 40. Plaintiff denied, when asked, that he had attempted to submit the ARP that was allegedly torn up. *Id*. When Gladhill asked why plaintiff did not submit the ARP that was allegedly destroyed, plaintiff replied that, "it took a long time to write that and it's probably too late." *Id*. Ultimately Gladhill concluded that plaintiff's claims were unfounded based on "the involved [o]fficers reports and verbal statement contradict the inmate's claims and with no way of proving either parties claims." *Id*., p. 37.

Plaintiff filed Inmate Grievance Office ("IGO") No. 20150525 on March 25, 2015, as an appeal of ARP-MCIH-0826-14 regarding the cell search.[3] ECF No. 30-9, p. 2, ¶ 3(a). The grievance was referred to the Office of Administrative Hearings (OAH). After a hearing before Administrative Law Judge ("ALJ") Robert J. Barry, on December 18, 2015, the ALJ proposed that the grievance was meritorious; however, the ALJ's decision was reversed by Order of the Secretary on July 7, 2017. *Id*. As such, the grievance was denied and dismissed. *Id*. Plaintiff filed an appeal of the Secretary's decision in the Circuit Court for Anne Arundel County which remained open as of the time of filing of Defendants' dispositive motion. *Id*.

---

[3] Inmate Grievance Office Administrative Officer Samiya Hassan is the custodian of IGO records and is familiar with Maryland's inmate grievance process. ECF No. 30-9, p. 2, ¶ 1. Hassan searched the IGO records regarding complaints or grievances where plaintiff alleged retaliation and intimidation and recovered four records, two relevant to defendants named in this complaint and the subject matter of this complaint. *Id*., ¶¶ 2-3.

### E.  December 5, 2014, pat down search and ARP MCIH-0897-14

On December 5, 2014, plaintiff was leaving his case manager's office and saw Colliflower at the entrance of his housing tier. ECF 82-2, pp. 11-12. When Colliflower saw plaintiff, he stared hostilely and directed Officer Reyes to pat plaintiff down. *Id.*, p. 12. While Reyes searched plaintiff, Colliflower stated, "Its just the beginning!" *Id.* After the search, Colliflower directed plaintiff to sit near his case manager's office where he waited for approximately 15 minutes before he was allowed to continue on his way. *Id.* Other inmates who came and went were not stopped or searched. *Id.* Plaintiff became fearful of Colliflower and feared that he "was about to begin a campaign of harassment." *Id.*, p. 12. Plaintiff alleges that Colliflower felt ill will toward him for asking to have the signed and dated copy of his ARP returned to him, for submitting ARP MCIH-0826-14, or both. *Id.*

On December 7, 2014, plaintiff submitted to Younker a continuation of the request he submitted on November 6, 2014 (later assigned ARP MCIH-0897-14), and including information about the pat down search. ECF 82-2, pp. 12-13. The ARP was dismissed for procedural reasons and plaintiff was directed to resubmit the ARP including the names of witnesses, how he could prove Colliflower was retaliating against him, how he could insinuate Colliflower's meaning, and whether plaintiff was physically harmed. ECF 30-3, p. 6.

Plaintiff resubmitted the ARP and Gladhill was assigned to investigate it. ECF 30-3, pp. 2-5, p. 13. In dismissing the ARP, Gladhill determined that plaintiff needed to understand that any officer has the right to request that he submit to a search and that Colliflower, as the Unit 5 Officer in Charge, has the responsibility to control the flow of contraband through the unit and ensure all inmates are subjected to random searches.[4] *Id.*, p. 14. The ARP was dismissed with a finding that

---

[4] An information report form dated April 2, 2015 was completed by Colliflower in response to ARP MCIH-0897-14. Colliflower reported that on December 5, 2014, he and several other officers conducted a cell search of plaintiff's

"There is no evidence to support your claim of harassment. The witnesses that were interviewed did not notice any wrongdoing. An officer has the right to search an inmate at any time." *Id*., p. 2. Plaintiff alleges that Colliflower fabricated that he directed Reyes to pat him down for purposes of intercepting contraband. ECF 82-2, p. 13.

Additionally, plaintiff claims that Gladhill's findings during his investigation into ARP MCIH-0897-14 are unreliable. ECF 82-2, p. 13. Plaintiff takes issue with the fact that the substance of Gladhill's interviews of Webb and Colliflower were not recorded; no information was provided regarding his interview of Reyes; and MCIH-0897-14 was a continuation of the complaints alleged in ARP MCIH-0826-14 but Gladhill did not consider any of that in his summary. *Id*.

### F.  March 24, 2015, encounter with Young and ARP MCIH 0208-15

On March 24, 2015, while plaintiff was going to lunch, Young crossed into his path, colliding with him with enough force to stop his forward motion. ECF 82-2, p. 29. Plaintiff asked another inmate to document what happened, but they declined to do so, citing their fear of retaliation. *Id*. Plaintiff reported the incident to Lt. Caudo but when he failed to receive follow up from Caudo he wrote an ARP and attempted to submit it to Sgt. Barnhardt who declined to accept it, stating he could not accept ARPs on weekends. *Id*. Plaintiff explained the ARP concerned the officer in charge of the 8-4 shift and Barnhardt replied, "Oh! You're the guy who files ARPs like every day! You know they can limit how many you file!" Plaintiff had no prior contact with Barnhardt and when he asked him how he heard this, Barnhardt simply replied that it was what he had heard, and it was going around. *Id*. Plaintiff claims he is entitled to submit ARPs daily. *Id*., pp. 29-30.

---

housing tier and the common areas and items of contraband were found and all inmates in the area searched. ECF 30-3, p. 21.

On April 7, 2015, plaintiff attempted to give Powell the ARP (later assigned MCIH 0208-15) concerning Young's collision. ECF 82-2, p. 30. Plaintiff alleges that Powell read the ARP and stated that he needed to be placed on protective custody, but plaintiff objected because protective custody was intended for threats between inmates. *Id*. Powell escorted plaintiff to an office and completed a protective custody form and told plaintiff that if he did not sign it he would be placed on administrative segregation 120. *Id*.

The ARP provided to Powell claimed that on March 24, 2015, Young purposefully bumped into plaintiff in a hallway in retaliation for his having previously filed an ARP against him. ECF 30-8, p. 2, ¶ 5 (Powell Decl.). Powell signed the ARP. *Id*., p. 2, ¶4. Powell avers that he asked plaintiff if he wanted to discuss the ARP informally and requested that he follow him to J-1 tier. *Id*., ¶ 6. Powell offered plaintiff placement on administrative segregation while the complaint was investigated but plaintiff declined because such a placement would not allow him to participate in his program and job. *Id*., ¶ 6.

Plaintiff also claims that Powell told him that he would not order Young to avoid contact with plaintiff. Plaintiff states that he signed a waiver of protective custody form, because he was afraid he would lose his housing, job assignment, and programming. ECF 82-2, p. 30. Plaintiff complains that if Powell had genuine concerns about his allegations he would have documented those concerns on an information report rather than a waiver of protective custody form. Additionally, plaintiff believes that Powell would have at least spoken to Young before stating that he would not give an order to Young to stay away from plaintiff and would have alerted his chain of command about plaintiff's allegations had his concerns about plaintiff's safety been genuine. *Id*. at 31. Plaintiff states that he is not aware of any policy requiring Powell to offer him protective custody housing given that his concerns were about staff not another inmate, and in any event,

those decisions are made by case management. *Id*. Moreover, plaintiff states that even if he had been assigned to protective custody or administrative segregation there is no policy that would have prevented Young from being assigned to that tier. *Id*., p. 32.

Powell avers that he used the waiver of protective custody form to document his exchange with plaintiff. ECF 30-8, p. 3, ¶ 7; ECF 30-3, p. 85. Plaintiff also claims that Powell implied that if he did not sign the form he would be placed on administrative segregation-120. ECF 82-2, p. 83.

Plaintiff alleges that as a supervisor, Powell was aware of plaintiff's allegations regarding Colliflower, Hixon, and Young either through his chain of command or through gossip among staff. ECF 82-2, p. 32. Plaintiff opines that Powell worked for years with Colliflower, Hixon and Young, and viewed them as friends, engaged in off duty activities with them, and was therefore disinclined to believe plaintiff's complaints. *Id*., p. 32. Plaintiff alleges that Powell was not concerned with his fate but wanted to deter him from submitting complaints against his friends and had an aversion to complaints against other officers. *Id*. Plaintiff alleges Powell has been the subject of inmate complaints and felt resentful about plaintiff questioning him about the use of protective custody and plaintiff's insistence on submitting MCIH-0208-15. *Id*., p. 33.

Additionally, plaintiff claims that on May 6 and 13, 2015, Powell assigned Young to plaintiff's housing tier. ECF 82-2, p. 33. On May 6 plaintiff asked Powell why he would assign Young to his tier and Powell replied, "You had a choice." *Id*., p. 33. Plaintiff took this to be a reference to the offer of protective custody. *Id*. Plaintiff alleges that Powell assigned Young to the tier due to resentment of plaintiff questioning him about the offer of protective custody and his unsuccessful effort to deter plaintiff from filing ARP MCIH-0208-15. *Id.* After Young's assignment to his tier, plaintiff suffered from panic and anxiety attacks. *Id*., pp. 33-34. Between

July 3, 2015, and October 26, 2015, plaintiff attempted to submit a complaint concerning Powell's actions, but the ARP was refused at MCIH and by the DOC ARP/IGP Unit. *Id*., p. 34.

Plaintiff filed an ARP dated July 2, 2015, claiming Lt. Powell engaged in retaliatory actions against him, specifically that Powell assigned Young to plaintiff's housing unit on May 6, 2015. ECF 30-3, pp. 79-85. Plaintiff acknowledged the ARP was untimely but sought its late acceptance. *Id*., pp. 81. To the best of his recollection, Powell states he did not participate in the assignment of Young to plaintiff's tier on that date. ECF 30-8, p. 3, ¶ 8. Additionally, Powell avers that he was not notified of any concerns regarding Young and plaintiff during the May 6, 2015 shift. *Id*.

In response to plaintiff's attempt to file the ARP directly to DOC Headquarters, the Headquarters ARP/IGP Coordinator sent plaintiff a memorandum dated July 15, 2015, with the subject "Will Not Accept for Processing," advising plaintiff that the ARP could not be processed because his intent was not discernible. ECF 30-3, p. 88. Plaintiff was reminded that his ARP must be completed in the proper form, signed and dated by an officer, and submitted to his Institutional Coordinator and then he must wait for the warden's response, or the time for the warden to respond to pass, before filing an appeal. *Id*.

Plaintiff filed IGO No. 20151992 on October 28, 2015, as a complaint about Lt. Powell's actions on April 7, 2015 and May 6, 2015, constituting a pattern of retaliation. ECF 30-9, p. 3, ¶ 3(d). The grievance was referred to OAH. After a hearing, the ALJ issued a Decision and Order dated October 3, 2017, denying and dismissing the grievance as without merit. *Id*. There is no evidence of any subsequent review of this final administrative decision. *Id*.

### G. Colliflower Interactions in April 2015, the Housing Request, and ARP MCIH-0254-15

On April 13, 2015, plaintiff approached Colliflower regarding the status of an ARP he submitted to another officer requesting to be moved to the southside annex housing. ECF 82-2,

pp. 13-14. Plaintiff claims that Colliflower advised him that the request would probably not be granted as that assignment was preferred housing. *Id*., p. 14. Plaintiff explained that he met the criteria for the move and asked Colliflower what he meant. Colliflower replied that they would "prefer you not be down there!" When plaintiff asked if this had anything to do with his complaints, Colliflower nodded in the affirmative. *Id*., p. 13. Plaintiff replied okay and walked away and Colliflower said, "You're going to write that up too?" Plaintiff indicated he would because he had not done anything wrong and Colliflower was bullying him. Colliflower suggested that he and plaintiff "handle it like men." *Id*., p. 14.

Plaintiff states that he submitted a written request to move to unit 5 (the southside) annex and met the criteria for the move. ECF 82-2, p. 14. He claims that he desired the additional privileges that came with living in that area. *Id*. In seeming support of his contention that Colliflower has some authority over the move, plaintiff states that on two occasions he asked Colliflower to have a specific inmate assigned to his cell and he received his requested cellmate. *Id*. Plaintiff further claims that Colliflower shared an office with the officer who received plaintiff's ARP requesting the move and therefore Colliflower would have had access to plaintiff's request for a housing change. *Id*. Plaintiff alleges that Colliflower continued to feel animus towards him and interfered with his request for a housing move. *Id*., p. 15.

On April 14, 2015, Colliflower called plaintiff into an office and stated that he did not hold any grudge. ECF 82-2, p. 15. Colliflower explained that he felt disrespected and asked plaintiff if he would sign something before reading it, but plaintiff explained that Colliflower's signature on the ARP was only an acknowledgement of receipt. Colliflower then became irate and ended the conversation, stating that he could not stop plaintiff from writing ARPs, he could only back up what he did. *Id*. Plaintiff alleges that Colliflower "continued to feel resentment towards [him] for

asserting his right to have the signed copy of his complaint against Varady or for having the audacity to file complaints against him." *Id*. He claims that Colliflower's goal in summoning him into the office was to deter him from pursuing his complaint. *Id*.

Regarding plaintiff's allegations about Colliflower's comments regarding the housing move, Colliflower does not recall the alleged April 2015 conversation. ECF 47-2, p. 3, ¶ 9. He avers however that he did not make any comments to plaintiff regarding the appropriateness of his being housed on the southside annex. *Id*.

Kelly Partlow, Case Management Specialist II, explains that there are five types of general population housing at MICH, two of which are pertinent to plaintiff's claims. ECF 47-3, pp. 2-3, ¶ 3; p. 5. From August 11, 2015, until January 14, 2016, plaintiff was housed in Unit 2, BHUT-1-008-S, which is considered privileged housing and part of the Western Program Development Center ("WPDC") dormitory. *Id*., p. 2, ¶ 4; p. 6. The WPDC dormitory Unit 2 is a 340-bed dormitory adjacent to the main building at MCIH. *Id*., p. 2, ¶ 3. The housing unit is referred to as Unit 2 and inmates with lower security risks and good adjustment are housed there. *Id*. The southside annex, where plaintiff requested to be moved, is part of the Annex dormitory housing and consists of Units 3, 4, 5 and 6, containing eight 24-bed open housing areas. *Id*. Assignment to these units is also considered honor housing and inmates must have a designated institutional need. *Id*. Partlow avers that for a variety of reasons, including overcrowded conditions, and other suitability concerns, including enemy alerts, inmates may not always be assigned to the housing unit of their choice. *Id*., p. 2, ¶ 5, p. 5.

Plaintiff filed ARP MCIH-0254-15 on May 4, 2015. ECF 30-3, pp. 108-15; ECF 82-2, p. 15. Plaintiff complained that Colliflower was retaliating against him for filing ARPs by interfering with his requests to move to preferred housing. ECF 30-3, pp. 108-15. The ARP was

dismissed for procedural reasons pending resubmission. Plaintiff's untimely resubmission was dismissed on June 2, 2015 for failure to resubmit in accordance with the ARP coordinator's instructions. *Id.*, p. 116.

On December 18, 2015, the ALJ issued a proposed order finding plaintiff's complaint regarding the cell search meritorious. ECF 82-2, pp. 16. On December 22, 2015, while on his way to his job, "Colliflower made eye contact with Plaintiff and called him a "bitch!" *Id.* Plaintiff alleges that Colliflower's statement on December 22, 2015, was a reaction to the ALJ's finding and was intended to intimidate him. *Id.* Colliflower avers that ARPs and IGO grievances are handled by institutional staff and he was not made aware of the outcome of the ALJ's December 18, 2015 decision. ECF 47-2, p. 3, ¶ 10. Sgt. Colliflower also denies calling plaintiff a bitch on December 22, 2015. *Id.* ¶ 11.

### H.  Encounters with Hixon

On September 24, 2015, a hearing regarding the cell search was held before Administrative Law Judge Barry. ECF 82-2, pp. 15-16. Hixon was supposed to appear as a witness at the hearing. *Id.*, p. 16. The following day, during lunch, Hixon pointed out plaintiff to another officer and laughed. *Id.*

On October 8, 2015, Hixon stopped plaintiff while plaintiff was retrieving his medication and asked him about his housing location and told plaintiff he "was giving him a warning." *Id.* Plaintiff alleges that Hixon's actions were the result of animus he felt toward plaintiff because of his complaint against Hixon and were intended to deter plaintiff's exhaustion of the claim. *Id.* On October 10, 2015, plaintiff filed an informal complaint with Dovey, concerning the October 8, 2015, interaction with Hixon. *Id.*, p. 17. Plaintiff alleges that Hixon engaged in continuous reprisals and he asked Dovey to stop them. *Id.*

### I.  Warden Dovey and ARP Coordinator Hartle

Plaintiff alleged that he spoke with Dovey on February 27, 2015, concerning ARP MCIH-0826-14 and Dovey stated that he was "disappointed" with the direction in which the investigation went and asked whether plaintiff was "okay here?" ECF 82-2, p. 20. Plaintiff asked whether Dovey was asking if he was safe in the institution and Dovey nodded. Plaintiff stated that given his job, program involvement, and opportunities he did not want to transfer. *Id*. "Dovey stated that Plaintiff had handled the matter appropriately and that he was concerned about his 'getting caught up.'" *Id*. Plaintiff alleges that Dovey's comments meant that he could not control Colliflower, Hixon, and Young and that the only way to assure no reprisals was a transfer. *Id*. Plaintiff alleges that Dovey's questions and comments were made to have plaintiff request a transfer so that he did not bring any new complaints. *Id*. After plaintiff's interaction with Warden Dovey on February 27, 2015, he continued to feel anxious and isolated. *Id*., pp. 25-26.

Dovey recalls inquiring if plaintiff had concerns about remaining at MCIH, and plaintiff advised that he did not have any concerns and wished to remain at MCIH. ECF 48-4, p. 3, ¶ 8. Further, to the best of his recollection he does not recall advising plaintiff he was concerned about him "getting caught up" and states that he had no reason to be concerned about plaintiff's welfare at MCIH because plaintiff advised that he wanted to remain at MCIH. *Id*.

Plaintiff alleges that Dovey and ARP Coordinator Hartle, who was also a case management supervisor (ECF 82-2, p. 23) were both aware that he appealed the dismissals of ARPs MCIH-0826-14 and 0897-17, claiming that the investigations were incomplete, insufficient, and biased (ECF 82-2, pp. 20-21) and they were aware he contacted Congressman Cummings and State Senator McFadden to have MCIH-0826-14 investigated. ECF 82-2, p. 21. Plaintiff alleges that both Dovey and Hartle were responsible for the proper administration of the ARP process. *Id*. He

claims that as a result of his appeals, the Commissioner "found compliance concerns with how MCIH staff processed, handled or investigated" his ARPs and communicated those concerns to Dovey and Hartle. *Id*. Plaintiff theorizes that "Dovey and Hartle were disgruntled by [his] appeals as they questioned the integrity of their operation of the ARP and exposed it to the scrutiny of the Commissioner" and that plaintiff's letter to elected officials also "disgruntled them." *Id*., p. 22.

Plaintiff states that he wrote a letter to Dovey on May 5, 2015, regarding his problems submitting complaints under the ARP process and seeking an end to the reprisals. ECF 82-2, p. 22. He sent another letter to Warden Dovey on July 22, 2015, concerning problems he had attempting to submit a complaint against Lt. Powell. *Id*., p. 22. On October 10, 2015, and December 22, 2015, plaintiff mailed informal complaints to Dovey concerning Hixon and Colliflower and requested that he not be transferred. *Id*., pp. 22-23.

Plaintiff claims that Hartle's dismissal of ARPS MCIH-0897-14, 0208-15, and 0254-15 were not in compliance with DCDs. ECF 82-2, p. 26. Additionally, after plaintiff filed MCIH-0826-13, Hartle came to his class and asked him why he thought he had been assaulted. *Id*., p 27. Plaintiff states that Hartle was required to report such an allegation to the Internal Investigation Division ("IID") regardless of whether she believed the allegation. *Id*. However, the allegation was not referred to the IID until after plaintiff filed an appeal of the ARP dismissal. *Id*., Plaintiff claims that the handling of his ARPs caused him anguish and frustration. *Id*.

Additionally, plaintiff claims that Warden Dovey "was in direct charge of the MCIH" and under Maryland law "was obligated to supervise the government, discipline, and policy of the MCIH and to enforce the regulations and directives of the DOC." *Id*. Dovey was responsible for the proper operation of the ARP and responsible for ensuring all staff were aware of the ARP process. *Id*.

Per DOC directives, Dovey is required to review responses to complaints and ensure they are appropriate. ECF 82-2, p. 28. Between November 6, 2014 and May 1, 2015, plaintiff submitted ARPS MICH 0826-14, 0897-14, 0208-15 and 0254-15. Each alleged a continued pattern of retaliation by Colliflower, Hixon and/or Young. ECF 82-2, p. 28. Plaintiff claims, without support, that Dovey had constructive knowledge prior to the submission of his first ARP that Colliflower, Hixon, and Young "took reprisals" against inmates in response to their submitting complaints and their acts posed a pervasive and unreasonable risk of deterring submissions. *Id*. Plaintiff further complains that Dovey did not relay his allegations to Colliflower, Hixon and Young's supervisor.[5] *Id*. Plaintiff alleges that Dovey's response was so inadequate that it amounted to deliberate indifference or tacit authorization of their action. *Id*. Plaintiff also alleges that there is a causal connection between Dovey's failure to act and the continued reprisals he has suffered. *Id*., pp. 28-29. Dovey's failure to act exacerbated plaintiff's panic attacks and anxiety. *Id*., p. 29.

Dovey explains that the warden's responsibilities are to act as the chief administrator of the institution, overseeing the administration of personnel and programs in order to ensure the safe, efficient and lawful functioning of the institution. ECF 30-5, p. 3, ¶ 8. He further avers that as Warden of MCIH he did not personally process inmates' ARPs or investigate their complaints. *Id*., ¶¶ 8-9. Inmate ARPs were handled by the institution's ARP officer and he relied on the investigations and findings of correctional staff to make final determinations about ARPs. *Id*. On November 5, 2014, Dovey directed Younker to interview plaintiff about his concerns. *Id*., ¶ 4.

Hartle was not personally involved in any of the incidents for which plaintiff filed ARPs. ECF 30-7, p. 2, ¶ 4. As the Institutional ARP Coordinator, Hartle, is responsible for

---

[5] On May 15, 2015, plaintiff spoke to Gladhill regarding his May 5 letter to the Warden. Gladhill asked plaintiff if he wanted to be transferred from MCIH. Plaintiff answered in the negative but agreed to be moved to a general population tier in the Antietam Housing Unit. ECF 82-2, p.22.

administratively processing inmate ARPs. *Id*. She avers that plaintiff's ARPs were processed in accordance with DOC directives. *Id*. She further notes that pursuant to procedures, plaintiff had the right to seek review of the institution's decisions by filing an appeal of the ARP response to headquarters. *Id*., ¶ 5.

Warden Dovey avers that he has not been involved in, nor has he interfered with, thwarted or delayed, the processing of plaintiff's ARPs. ECF 30-5, p. 3, ¶ 10. He denies having any personal knowledge of any staff being involved in interfering with, thwarting, or delaying the processing of plaintiff's ARPs. *Id*, ¶ 11.

ARP MCIH-0208-15, filed April 7, 2015, (ECF 30-3, pp. 72-77), concerned plaintiff's claims regarding his conversation with Dovey on February 27, 2015; Dovey expressing disappointment at the direction ARP MCIH-0826-14 took; and asking whether plaintiff was okay at the institution. *Id*., p. 76. The ARP was dismissed pending resubmission. *Id*., p. 72. Rather than resubmit the ARP, plaintiff filed a Headquarters Appeal alleging he did not receive a response from the Warden. *Id*., p. 78. The appeal was dismissed on September 17, 2015, for procedural reasons, because plaintiff failed to resubmit the ARP in accordance with the coordinator's instructions. *Id*.

**J. Transfer**

During plaintiff's January 21, 2015, parole hearing it was recommended that he continue in cognitive programming. ECF 82-2, pp. 23-24. This recommendation would have been placed in his base file and been known to case management staff. *Id*. p. 24. Plaintiff was not transferred until January 14, 2016 to Jessup Correctional Institution ("JCI"). *Id*. Plaintiff claims that per the case Management Manual inmates are transferred and housed in accordance with identified security, medical, and programming needs. Plaintiff states that he was not aware of any security, medical

21

or programming needs that would support his transfer. *Id*., p. 24. As a result of the transfer, plaintiff

lost his privileged housing assignment, could no longer participate in cognitive programming, and

lost his job which earned him a daily wages and diminution of confinement credits. *Id*., p. 25.

Plaintiff did not request a transfer from MCIH. *Id*., p. 23.

Plaintiff's reclassification instrument prepared on March 16, 2015, recommended plaintiff

continue in his job, and remain housed in a medium security facility, which MCIH was, and did

not recommend a transfer. *Id*. The Security Reclassification Instrument is conducted by case

management staff and per the Case Management Manual the warden's only role is to review the

decision. ECF 48-5, pp. 5-6 (Excerpt Security Reclassification Instrument).

The "Recommended Institution" section of the reclassification instrument provides that:

> Unless reasons exist that warrant identification of a specific facility, inmates shall
> be classified to an overall security designation that will allow their transfer if
> necessary to any other facility of appropriate security level (any max, any med, any
> min, or any pre[release]). This will negate the need for further reclassification
> action should it become necessary to transfer the inmate prior to his/her next
> scheduled security review.

*Id*., p. 4.

Plaintiff was not transferred until January 14, 2016. Dovey avers that he did not request,

direct or participate in the transfer of plaintiff from MCIH and was not made aware of any requests

by staff to have him moved. ECF 48-4, p. 3, ¶ 9.

Plaintiff opines that Dovey and Hartle were concerned that plaintiff's complaints would

bring scrutiny to the facility's operation and viewed him as a complainer. ECF 82-2, p. 25. As

such, plaintiff contends they acted together and with unidentified staff to effect his transfer. *Id*.

Alternatively, plaintiff postulates they felt resentment toward him for his criticism of the facility's

handling of his complaints and orchestrated his transfer to end them. *Id*.

Warden Dovey specifically denies directing the transfer of plaintiff from MCIH to JCI. ECF 30-5, p. 3, ¶ 12. Dovey further avers, to the best of his knowledge, the transfer decision was not made by MCIH staff and was not made in retaliation for plaintiff's exercising his right to use the grievance process. *Id.* Younker also denies requesting, directing, or participating in the transfer of plaintiff from MCIH and was not made aware of any request by staff to have him moved. ECF 48-2, p. 3, ¶ 8.

### Standard of Review

Defendants filed their Motion as a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. Typically, when deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court considers only the complaint and any attached documents "integral to the complaint[.]" *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). To the extent that grounds for dismissal are based solely on the contents of the complaint, the court may dismiss under Rule 12(b)(6) if the complaint does not allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although courts should construe pleadings of self-represented litigants liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), legal conclusions or conclusory statements do not suffice, *Iqbal*, 556 U.S. at 678. The court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Rule 12(d) requires courts to treat a Rule 12(b)(6) motion as a motion for summary judgment when matters outside the pleadings are considered and not excluded. Fed. R. Civ. P.

12(d). Before converting a motion to dismiss to one for summary judgment, courts must give the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* "Reasonable opportunity" has two requirements: (1) the nonmoving party must have some indication that the court is treating the Rule 12(b)(6) motion as a motion for summary judgment, and (2) the nonmoving party "must be afforded a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (citation omitted). Here, the notice requirement has been satisfied by the title of the Motion. To show that a reasonable opportunity for discovery has not been afforded, the nonmoving party must file an affidavit or declaration under Rule 56(d) explaining why "for specified reasons, it cannot present facts essential to justify its opposition," Fed. R. Civ. P. 56(d), or otherwise put the district court on notice of the reasons why summary judgment is premature, *see Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244-45 (4th Cir. 2002). Here, plaintiff sought and received an opportunity to engage in discovery. *See e.g.* ECF 69, 73, 76, 77, 81, and 93. Under these circumstances, the court will construe defendants' motion as a motion for summary judgment.

Under Federal Rule of Civil Procedure 56, the court shall grans summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the motion, the court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). The nonmoving party has the burden to show a genuine dispute on

a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*,

477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the

nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

## Analysis

Defendants contend that they are entitled to dismissal or summary judgment in their favor

because: there is no supervisory liability for § 1983 claims; they did not retaliate against plaintiff

or interfere with his First Amendment right to file grievances; verbal threats and harassment do

not state a constitutional claim; plaintiff has failed to state a claim against Hartle; violations of

defendant's own policies and procedures do not provide a basis for a due process violation;

plaintiff's transfer was not retaliatory; they are entitled to qualified immunity; plaintiff has failed

to exhaust his administrative remedies; and defendants did not conspire to retaliate against

plaintiff. ECF 30-1, 47-1, 63 and 97.

### A.  Exhaustion

Defendants contend that portions of plaintiff's complaint are subject to dismissal pursuant

to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e, because they have not been

properly presented through the administrative remedy procedure. ECF 47-1, p. 13. The PLRA

provides in pertinent part that:

> No action shall be brought with respect to prison conditions under section 1983 of
> this title, or any other Federal law, by a prisoner confined in any jail, prison, or
> other correctional facility until such administrative remedies as are available are
> exhausted.

42 U.S.C. § 1997e(a).

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained

in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for,

violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see Chase v. Peay*, 286 F. Supp. 2d 523, 528 (D. Md. 2003).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendants. *See Jones v. Bock*, 549 U.S. 199, 215-16 (2007); *Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F. 3d 674, 682 (4th Cir. 2005). Nevertheless, a claim that has not been exhausted may not be considered by this Court. *See Bock*, 549 U.S. at 220. In other words, exhaustion is mandatory, and a court usually may not excuse an inmate's failure to exhaust. *See Ross v. Blake*, 578 U.S. __, 136 S.Ct. 1850, 1856-57 (2016).

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. *Moore v. Bennette*, 517 F.3d 717, 725, 729 (4th Cir. 2008); *see Langford v. Couch*, 50 F. Supp. 2d 544, 548 (E.D. Va. 1999) ("[T]he. . . . PLRA amendment made clear that exhaustion is now mandatory."). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006). This requirement is one of "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Id.* at 93 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)) (emphasis in original). But the Court is "obligated to ensure that any defects in [administrative] exhaustion were not procured from the action or inaction of prison

officials." *Aguilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).

To pursue a grievance, a prisoner confined in a Maryland prison may file a grievance with the Inmate Grievance Office ("IGO") against any Division of Correction official or employee. Md. Code Ann. (2008 Repl. Vol.), Corr. Servs. ("C.S.") § 10-206(a). However, if the prison has a grievance procedure that is approved by the IGO, the prisoner must first follow the institutional ARP process before filing a grievance with the IGO. *See* C.S. § 10-206(b).

Inmates housed at an institution operated by Maryland Department of Public Safety and Correctional Services ("DPSCS") may avail themselves of the administrative grievance process which is designed for "inmate complaint resolution." *See generally* C.S. §§ 10-201 *et seq.*; Code of Maryland Regulations ("COMAR") 12.07.01.01B(1) (defining "ARP"). If an ARP is filed and denied, the prisoner may appeal the denial within 30 days to the Commissioner of Correction.

If the Commissioner of Correction denies the appeal, the prisoner may file a grievance with the IGO, also within 30 days. C.S. § 10-206(a); C.S. § 10-210; COMAR 12.07.01.05B. The prisoner must include in the grievance copies of the initial request or administrative remedy, the Warden's response to that request, a copy of the ARP appeal filed with the Commissioner of Correction, and a copy of the Commissioner's response. COMAR 12.07.01.04(B)(9)(a). If the grievance is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing. C.S. § 10-207(b)(1); *see* COMAR 12.07.01.07B. An order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review. C.S. § 10-207(b)(2)(ii).

Here, plaintiff filed the following ARPs and ARP appeals:

1. ARP MCIH-0826-14: This ARP, dated November 5, 2014, concerns plaintiff's claims that he attempted to submit the Varady ARP to Colliflower and then the following day his cell was searched by Colliflower, Hixon and Young and the Varady ARP destroyed. ECF No. 30-3, pp. 25-31. On December 4, 2014,

Warden Dovey was granted a 15-day extension to respond to plaintiff's ARP. *Id.*, p. 35. The ARP was investigated by Lt. Gladhill. *Id.*, p. 36. The ARP was dismissed. On January 3, 2015, plaintiff filed an appeal of the Warden's response. *Id.*, p. 46. In response to his appeal a headquarters investigation was undertaken. *Id.*, pp. 70-71. The investigator concluded that there were no witnesses to corroborate plaintiff's allegations and several officers stated all actions were taken within the scope of their duties. *Id.*, p. 71. On February 18, 2015, the Commissioner dismissed plaintiff's appeal finding that he failed to substantiate his claim that he was assaulted by staff or that staff acted in a less than professional manner during the cell search. *Id.*, p. 69. The Commissioner further noted that IID was notified of the allegation but did not create a case number. *Id.* Plaintiff filed a grievance with the IGO (No. 20150525) on March 25, 2015. ECF 30-9, p. 5. The grievance was referred to an ALJ for a hearing, who found plaintiff's grievance meritorious. *Id.*, pp. 5-21. However, that decision was reversed by Order of the Secretary on July 7, 2017. *Id.*, pp. 25-26. This claim was therefore exhausted.

2.   ARP MCIH-0897-14: This ARP is dated December 7, 2014, and purported to be a continuation of ARP MCIH-0826-17. ECF 30-3, p. 6. This ARP concerns Colliflower's directing Reyes to pat plaintiff down on December 5, 2014. Plaintiff was directed to resubmit the ARP by December 30, 2014, including witnesses and additional information regarding proof as to Colliflower's intent. *Id.*, p. 6. Plaintiff resubmitted the ARP on December 20, 2014, and stated that it was a continuation of ARP MCIH-0826-14 and also a resubmission of ARP-MCIH-0897-14. *Id.*, pp. 2-3. The ARP MCIH 0897-14 was investigated by Lt. Gladhill. *Id.*, pp. 13-14. The resubmitted ARP was dismissed on January 15, 2015, with a notation that the ARP had been investigated and there was no evidence to support the claim of harassment. Plaintiff was reminded that an officer has the right to search an inmate at any time. *Id.*, p. 2. Plaintiff filed a grievance with the IGO (No. 20150678) on April 16, 2015. The grievance was dismissed by the IGO on May 19, 2015, for failure to state a claim. ECF 30-9, p. 3, ¶ 3(b). This claim was therefore exhausted.

3.   ARP MCIH 0208-15: This ARP is dated April 3, 2015, and concerns plaintiff's allegation that Young retaliated against him by purposefully colliding with him in the hallway. ECF 30-3, pp. 72-73. Plaintiff also complained that Dovey had not taken any corrective actions regarding his repeated claims of retaliation by officers. On April 14, 2015, the Institutional ARP Coordinator Hartle directed plaintiff to resubmit the ARP by April 29, 2015, limiting the ARP to the incident and directing him not to include conversations with the Warden. *Id.*, p. 92. Plaintiff appealed the dismissal of his ARP alleging that the Warden failed to respond to the initial ARP. On September 15, 2015, Cpl. Hill-Peay of the ARP/IGP Unit at DPSCS Headquarters emailed LeeAnn Crawford inquiring whether a response to MCIH-0208-15 was signed by the Warden. *Id.*, p. 99. Crawford advised that plaintiff failed to resubmit the ARP. *Id.* The ARP was dismissed at the institutional level due to plaintiff's failure to resubmit the ARP

as requested by the ARP coordinator. *Id.*, p. 78. In his appeal, plaintiff attempted to add claims regarding Powell allegedly assigning Young to his tier and his interaction with Powell regarding the protective custody waiver. *Id.*, pp. 80-82. On July 15, 2015, the Office of Commissioner advised plaintiff that they would not accept his ARP stamped received on June 7, 2015, because his intention was unclear. He was advised that if he was attempting to appeal an institutional decision, he needed to file an "Appeal of Procedural Dismissal/Warden's Response/No Response" using the appropriate forms. *Id.*, p. 88. Plaintiff filed IGO No. 20151992 on October 28, 2015, complaining of Powell's actions on April 7 and May 6, 2015. ECF 30-9, p. 31. The grievance was referred to an ALJ and on October 3, 2017, after a hearing, the grievance was denied and dismissed as being without merit. *Id.*, pp. 31-40. This claim was therefore not properly exhausted as Smith failed to adhere to the procedural requirement of filing an appeal of procedural dismissal.

4. ARP MCIH-0254-15: Plaintiff filed this ARP on April 29, 2015, alleging that Sgt. Colliflower retaliated against him for filing ARPs MCIH-0826-14 and MCIH-0897-14 by interfering with his request to move to the southside annex/preferred housing. *Id.*, p. 109. The ARP was dismissed on May 8, 2015, and plaintiff was directed to resubmit the ARP by May 23, 2015, with only one issue, to clarify if the complaint was about being placed on a list for housing, and to be specific and to the point. *Id.*, p. 108. On May 27, 2015, plaintiff filed an appeal to the Commissioner. *Id.*, p. 116. Plaintiff alleged that the dismissal of his ARP was arbitrary and capricious and not in compliance with DCDs. *Id.*, p. 117. The appeal was dismissed on June 2, 2015, for procedural reasons, with a notation that plaintiff failed to resubmit the ARP in accordance with the coordinator's instructions. *Id.*, p. 116. Plaintiff filed a grievance with the IGO (No. 20151246) on July 16, 2015. The grievance was administratively dismissed on July 30, 2015, for failure to state a claim. ECF 30-9, p. 3, ¶ 3(c). This claim was therefore not properly exhausted as Smith failed to adhere to the procedural requirement that he resubmit his ARP.

As discussed above, the PLRA requires that inmates exhaust all available remedies. Because plaintiff failed to do so, the court will dismiss plaintiff's claims that: Young collided with him; his transfer to JCI was improper; Colliflower retaliated against him by interfering with his request to be transferred to the southside annex and by calling him a bitch; Powell improperly assigned Young to plaintiff's housing tier; and Hixon pointed and laughed at him and stopped him when retrieving medications on September 24, 2015.[6] However, the claims arising out of MCIH

---

[6] In response to these allegations, defendants provide briefing on the legal standards for due process and Eighth Amendment claims. The court does not read plaintiffs' complaint, or his briefing, as attempting to state a claim

0826-14 and MCIH 0897-14 relating to the search of Smith's cell and the pat down were properly exhausted. The court will evaluate the merits of those claims below.

### B. Claims Against Dovey, Younker, and Powell

Plaintiff alleges that Warden Dovey, Lt. Powell, and Capt. Younker failed to correct Colliflower, Young, and Hixon's misconduct. Thus, plaintiff's theory of liability as to defendants Dovey, Powell, and Younker is premised on the doctrine of respondeat superior.

It is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (explaining that there is no respondeat superior liability under § 1983). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Thus, supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to, or tacit authorization of, the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

Such evidence is lacking in this case. First, plaintiff's claims against Dovey fail. Dovey's sole role as chief administrative officer of MCIH was to assign staff to investigate each of

---

under any provision of the Constitution other than the First Amendment. Even if plaintiff's complaint could be so construed, these claims are all subject to dismissal for failure to exhaust administrative remedies.

plaintiff's concerns that were brought to his attention. Dovey is permitted to rely upon staff's ARP investigations and recommendations for institutional responses. In response to Younker's recommendations that plaintiff's complaints be further investigated by IID, Dovey directed that the investigation proceed. In response to later informal complaints by plaintiff, Dovey directed that staff inquire as to plaintiff's safety. Additionally, there is simply no evidence that Dovey had any involvement in plaintiff's transfer from MCIH.

As to plaintiff's claims against Younker, Dovey assigned him to investigate plaintiff's claims regarding the cell search. After Younker completed his investigation, he recommended that the matter be investigated further, which was done. Younker had no further involvement in plaintiff's complaint. Even if plaintiff's allegation is true that Younker told him he was no longer involved in the investigation and was disappointed that plaintiff contacted elected officials regarding his complaints, there is no evidence that such statements were untrue or were made in an effort to suppress plaintiff's use of the grievance process. To the contrary, after plaintiff complained to outside officials, investigation of his complaints continued at the institutional level, through the IGO, resulting in a hearing before an ALJ. There is simply no evidence that Younker did anything other than investigate plaintiff's complaints and recommend that they be given further consideration through the internal investigation process.

Plaintiff's conclusory claims that Younker was a supervisor to Colliflower, Young, and Hixon and/or that he had a duty to report plaintiff's allegations to their direct supervisors when Younker became aware of plaintiff's allegations are simply unsupported by the record which demonstrates that plaintiff's ARPs were fully investigated. Younker was not responsible for investigating the ARPs. Nothing in the record supports plaintiff's allegations as to Younker.

Similarly, plaintiff's efforts to hold Powell accountable are unavailing. Plaintiff approached Powell in an effort to submit an ARP wherein he complained that he was being repeatedly retaliated against by staff. Rather than ignore plaintiff's claims, Powell offered plaintiff protective custody housing and/or administrative segregation housing while an investigation of the claims could be undertaken. While plaintiff takes issue with whether the form used to document his conversations with Powell was the proper form, it is clear that rather than ignore plaintiff's complaints, Powell endeavored to address plaintiff's stated concerns. Powell's effort to informally address the complaint before forwarding the ARP for processing was permissible under the circumstances. Powell's conduct demonstrated a sincere effort to address plaintiff's concerns. Plaintiff's claims regarding Powell's offer of protective custody do not demonstrate that he was deliberately indifferent or tacitly authorized improper conduct of other officers. On each occasion, plaintiff reported that he was safely housed. The allegations regarding Powell's motivations are nothing more than speculation. Moreover, ARP submissions about correctional officers do not prevent the assignment of the officer to the unit where the inmate is housed: it would be impracticable if not impossible to do so given the sheer number of ARPs filed at an institution. There is no evidence that Powell was directed not to assign Young to plaintiff's housing unit and there is no allegation that anything happened while Young was so assigned. (*See* ECF 30-8, p. 3, ¶ 8).

While each of the named supervisory defendants had some knowledge of plaintiff's complaints, they each took reasonable steps in response to those allegations by having the matters investigated, referred to internal investigation, and/or by offering plaintiff alternative housing. Plaintiff cannot take each supervisory defendants' sincere efforts at resolving his stated concerns and conclude, without evidence, that their actions were an effort to chill his use of the grievance

process. Plaintiff's allegations against Dovey, Younker, and Powell are insufficient to support supervisory liability under § 1983. If anything, he alleges facts demonstrating that the supervisory defendants properly investigated and responded to his concerns. Moreover, the record evidence demonstrates that none of these defendants was personally involved the conduct complained of, thus entitling them to summary judgment. The court will grant summary judgment in favor of Dovey, Younker, and Powell, as there is no evidence that these defendants authorized or displayed indifference concerning the misconduct alleged in this case.

### C.      Retaliation

Plaintiff's retaliation claim is most fairly construed as a claim that he suffered retaliation for exercising his First Amendment right to petition for the redress of grievances. "The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). To state a claim of retaliation for exercising First Amendment rights, a plaintiff must show that: (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected the First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005).

While "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large," "incarceration does not divest prisoners of all constitutional protections." *Shaw v. Murphy*, 532 U.S. 223, 228–29 (2001). "[A] prison inmate retains those First Amendment rights that are not inconsistent with the status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*,

417 U.S. 817, 822 (1974). Specifically, the Fourth Circuit has held that an inmate's "right to file a prison grievance free from retaliation" is protected by the First Amendment. *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 545 (4th Cir. 2017).

A plaintiff can establish retaliatory conduct if the defendant took an action that "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (internal quotation marks and citations omitted). A plaintiff must also demonstrate a causal connection between his First Amendment activity and the alleged retaliatory action. *See Constantine*, 411 F.3d at 501. The showing can be based on circumstantial evidence, such as evidence that the defendant was aware of the First Amendment activity and that the retaliatory act was temporally proximate to that activity. *Id.*

In the prison context, courts "treat [claims of retaliation] with skepticism because 'every act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'" *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (citing *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)). As such an inmate cannot simply assert a generalized retaliatory animus but must allege facts that support the claim of retaliation. *White v. White*, 886 F. 2d 721, 724 (4th Cir. 1989). Moreover, a retaliation claim fails if there is another legitimate reason for the alleged retaliatory action. *Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

Plaintiff asserts that after he attempted to file an ARP against Varady for his conduct in the medical unit, Colliflower called for his cell search and conspired with Young and Hixon to destroy the ARP. Evidence of retaliatory conduct exists where the defendant took adverse action against the plaintiff that would "deter a person of ordinary firmness from the exercise of First Amendment rights." *Martin*, 858 F.3d at 249 (quoting C*onstantin*e, 411 F.3d at 500). Given the temporal

proximity between the relevant events, there is a colorable inference that Colliflower, Young, and Hixon took adverse action against plaintiff—i.e., threatening him with segregation, searching his cell, destroying his ARP, and subjecting him to a pat-down search—in retaliation for attempting to file the Varady ARP.

Defendants Colliflower, Hixon, and Young are not entitled to summary judgment as to this claim. Even though Colliflower explains that the cell search was in response to an anonymous tip, no evidence of the anonymous tip beyond Colliflower's declaration has been provided. The information regarding the anonymous tip was not written until well after the cell search and only in response to the investigation of plaintiff's ARP regarding the search. Further, the parties dispute whether the Varady ARP was found and destroyed as alleged by plaintiff, creating a material dispute of fact.

### D.    Conspiracy

To establish a civil conspiracy under § 1983, plaintiff must present evidence that defendants acted jointly in concert and that some overt act was done in furtherance of the conspiracy, which resulted in deprivation of a constitutional right. *See Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996). Without an agreement, the independent acts of two or more wrongdoers do not amount to a conspiracy. *See Murdaugh Volkswagen v. First Nat'l Bank*, 639 F.2d 1073, 1075-76 (4th Cir. 1981). Thus, a plaintiff must allege facts establishing that defendants shared a "unity of purpose or a common design" to injure him. *Id.* (quoting *Am. Tobacco Co. v. United States*, 328 U.S. 781, 809–10 (1946)). "Independent acts of two wrongdoers do not make a conspiracy." *Id.* at 1076. "A conspiracy may . . . be 'inferred from the things actually done.'" *Id.* at 1075 (quoting *Overseas Motors, Inc. v. Imported Motors Ltd., Inc.,* 375 F. Supp. 499, 531 (E.D. Mich. 1974)). However, circumstantial evidence consisting of "coincidence piled

on coincidence" are insufficient where the "proof of collusion is simply too attenuated" to conclude there was a conspiracy to violate the law. *Id*.

Here, plaintiff alleges that, pursuant to Colliflower's instructions, Young and Hixon searched his cell, looking for the Varady ARP, and destroyed it. For their part, Colliflower, Young, and Hixon deny destroying the ARP. Though plaintiff's factual allegations are somewhat thin on this point, there nevertheless remains sufficient evidence of concerted action to create a material dispute of fact as to whether defendants Colliflower, Young, and Hixon were acting in concert to suppress plaintiff's First Amendment rights. The court will therefore permit this claim to move forward along with the related claim for retaliation. Accordingly, defendants Colliflower, Young, and Hixon are not entitled to summary judgment on this claim.

Next, to the extent plaintiff claims that Dovey and Hartle engaged in a conspiracy to deprive him of his First Amendment rights in the processing of his ARPs, his claim fails. As explained previously, the claims against Dovey lack evidence of personal participation. And with respect to Hartle, the denial of ARP requests alone does not warrant liability. *See Adams*, 40 F.3d at 75 (holding inmates have no constitutional entitlement or due process interest in access to grievance procured and cannot bring claim for denial of access to a specific grievance process); s*ee also Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (allegation that warden "rubber stamped" grievances was not enough to establish personal participation) (citing *Whitington v. Ortiz,* 307 F. Appx. 179, 193 (10th Cir. 2009) ("denial of the grievances alone is insufficient to establish personal participation in the alleged constitutional violations.")). Dovey and Hartle are therefore entitled to summary judgment on the civil conspiracy claim.

### E.    Qualified Immunity

Having concluded that Colliflower, Young, and Hixon are not entitled to summary judgment as to plaintiff's claims that in violation of the First Amendment they conspired to, and

did, retaliate against him by searching his cell and destroying the Varady ARP because he filed grievances, the court must now determine if defendants Colliflower, Young, and Hixon are entitled to qualified immunity.

"[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 583 (4th Cir. 2017) (alteration in original) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). To overcome an official's qualified immunity defense, a plaintiff must establish "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

An "official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Id.* at 741 (alterations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). When determining whether a right is clearly established, "a court does not need to find 'a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Crouse*, 848 F.3d at 583 (quoting *al-Kidd*, 563 U.S. at 741). The Fourth Circuit has previously held that an inmate's "right to file a prison grievance free from retaliation" is protected by the First Amendment. *Booker*, 855 F.3d at 545. In so concluding, the Fourth Circuit recognized that the "unanimity among our sister circuits demonstrates that the constitutional question is 'beyond debate.'" *Id.* Although *Booker* was decided in 2017, the court determined that the right to be free from retaliation for filing a

prison grievance was clearly established at the time Booker alleged he was retaliated against in 2010 and defendants in that case were not entitled to qualified immunity. *Id.* at 545.

Here, plaintiff has alleged that defendants Colliflower, Hixon and Young violated his First Amendment right by retaliating against him for filing grievances. That right was "clearly established" at the time defendants allegedly violated it in November 2014. Thus, defendants Colliflower, Young, and Hixon are not entitled to qualified immunity as to plaintiff's retaliation and conspiracy claims.

**Conclusion**

Summary judgment will be granted in favor of Defendants Dovey, Hartle, Powell, and Younker on all claims. The court will deny the motion for summary judgment as to plaintiff's claims of retaliation and conspiracy against Colliflower, Young, and Hixon regarding the search of plaintiff's cell and destruction of the Varady ARP. Finally, the court will dismiss the claims against Colliflower, Young, and Hixon which plaintiff failed to properly exhaust. A separate Order follows.

3/22/2021                                         /s/
Date                                              Catherine C. Blake
                                                  United States District Judge